UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:12-cr-31-01-SM |
| ) | |
| MICHAEL T. PRIETO ) | |

UNITED STATES' OBJECTION TO DEFENDANT'S MOTION FOR A *BOOKER* VARIANCE AND RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM

The United States of America, by Donald A. Feith, Attorney for the United States Acting Under Authority Conferred By Title 28, United States Code, Section 515, objects to the defendant's motion for a non-guidelines sentence and the other claims raised in his Sentencing Memorandum as follows:

The trial evidence proved beyond a reasonable doubt that the defendant directed a mail fraud scheme through which his organization defrauded lenders of more than $14 million in mortgage and home equity loans on 54 properties.  As a direct result of that conduct, all of the fraudulently obtained loans went into default and most of the properties that secured those loans were foreclosed upon and ultimately sold for far less than the outstanding loan balances, resulting in losses of millions of dollars by the lenders and entities that held the notes.  All of the harm was foreseeable to the defendant, who had years of experience in the mortgage lending industry and who continued his employment as a loan originator for Countrywide Home Loans during the first 14 months of the mail fraud scheme he perpetrated.  The egregiousness of the defendant's conduct is not substantially mitigated by market conditions when he committed this crime, his lack of a prior criminal record, his familial ties and obligations, or any psychological distress he may be experiencing.  Nor is it mitigated by the sentences imposed on the other participants in the scheme who were subordinate to and played lesser roles than the defendant

and who accepted responsibility for their crimes and assisted the United States in prosecuting this case. Based on the defendant's conduct and the gravity of the losses it caused, a sentence below the applicable advisory sentencing guidelines is not warranted in this case.

<u>Loss Amount Properly Calculated In the Presentence Investigation Report</u>

The defendant's objection to the methodology used in the Presentence Investigation Report (PSR) to compute the total loss amount is misplaced. The total loss amount was properly calculated in the PSR as the aggregate difference between the outstanding principal balances of the fraudulently obtained loans and the amounts the note holders obtained by selling the properties that secured the loans. (PSR ¶ 14). Since the total loss was $5,617,555, the PSR properly increased the defendant's offense level by 18 levels under U.S.S.G. § 2B1.1(b)(1)(J).[1]

The general rule under U.S.S.G. § 2B1.1(b)(1) is that "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, comment. (n.3(A)). Additionally, "[t]he Court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1, comment. (n.3(C)). The proper computation of loss in mortgage fraud cases one like this was comprehensively explained in *United States v. Appolon*, 695 F.3d 44 (1st Cir. 2012). It provides as follows:

> As the term implies, actual loss is the reasonably foreseeable loss that actually resulted from an offense. *See* U.S.S.G. § 2B1.1 cmt. n. 3(A)(i). The extent of actual loss may depend on fortuities that minimize or exacerbate the effects of the defendant's fraudulent conduct. Intended loss is the loss that the defendant could have reasonably expected to occur at the time he or she perpetrated the fraud. In that respect, intended loss is frequently a better measure of culpability than actual loss.
>
> In cases where a defendant has pledged collateral to secure a fraudulent loan, actual loss usually can be calculated by 'subtracting the value of the collateral—or, if the lender has foreclosed on and sold the collateral, the amount of the sales price—from the amount of the outstanding balance on the loan.'

---

[1] U.S.S.G. § 2B1.1(b)(1)(J) requires an 8-level increase required when loss amount is more than $2,500,000, but not more than $7,000,000.

> (quoting *United States v. James,* 592 F.3d 1109, 1114 (10th Cir.2010)). "[T]he damage wrought by fraud is sometimes difficult to calculate," however. (quoting *United States v. Agboola,* 417 F.3d 860, 870 (8th Cir.2005)). If actual loss cannot be determined, a district court may safely use intended loss in its computations, and vice versa. Of course, if both can be determined, the Guidelines require the use of the larger amount. If neither actual loss nor intended loss can be gauged, a district court may use, as a last resort, "the gain that resulted from the offense as an alternative measure of loss." U.S.S.G. § 2B1.1 cmt. n. 3 (B).
>
> The application of these principles in mortgage fraud cases must account for the fact that the original mortgage lender frequently is not the lender who forecloses on a property and receives the proceeds from the foreclosure sale. Even if the original lender sells the mortgage to a successor lender, though, and there are subsequent transactions of the same kind, actual loss is always the difference between the original loan amount and the final foreclosure price (less any principal repayments). The commentary to U.S.S.G. § 2B1.1 "does not direct us to focus on harm to any particular victim; rather, it mandates that we focus on the *total* loss resulting from the commission of fraud to the extent the total loss is reasonably foreseeable." (quoting *James*, 592 F.3d at *Id.* at 1117 (Lucero, J., concurring) (citing U.S.S.G. § 2B1.1 cmt. n. 3(A)(i)). Thus, provided that the total actual loss is reasonably foreseeable, its apportionment as between the original lender and a successor lender (or other downstream purchaser) does not matter. The same is true of intended loss. The focus is not on any particular lender to the exclusion of others, but rather on the total degree of loss that the defendant could have reasonably expected to occur. *See United States v. Bonanno,* 146 F.3d 502, 509–10 (7th Cir.1998) ("[T]he relevant inquiry is ... 'How many dollars did the culprits' scheme put at risk?' ").

*Appolon*, 695 F.3d at 66-67 (citations omitted).

In accordance with *Appolon's* directive, the loss in this case should be calculated by "subtracting from the outstanding balance on the mortgage loan either the sum recouped via foreclosure or, if there was no foreclosure, the property's fair market value at the time of sentencing." *Id*. at 68. This is the methodology applied in the PSR and the resulting aggregate

- 3 -

loss amount of $5,617,555 (PSR ¶ 14) is the proper figure to determine the applicable offense level under U.S.S.G. § 2B1.1(b)(1).

The defendant erroneously contends that the PSR used the wrong transaction as the final foreclosure sale for most of the properties and posits that it should have used an earlier transaction, usually for a much larger amount, to determine loss. The fallacy of this argument is that the transactions the defendant relies upon were not final foreclosure sales that resulted in payments that offset some portion of the outstanding loan balances, but instead were credit bids the note holders made at foreclosure auctions to obtain title to the properties securing the loans so they could later sell them to mitigate their losses. Nearly all of the fraudulently obtained loans in this case were sold or transferred in the secondary mortgage market to successor holders of the loan notes. When the loans went into default, foreclosure proceedings were commenced on the properties collateralizing the loans. In nearly every instance, the entities holding the notes paid themselves to acquire title to the properties via a foreclosure deed to preserve their ability to sell the properties at a later date to recoup some of their losses on the fraudulently obtained loans. Contrary to the defendant's arguments, these transactions were not final foreclosure sales that should be used to determine the loss amount.

The identical loss calculation argument the defendant advances in this case was soundly rejected in *United States v. Green*, 648 F.3d 569, 583-84 (7th Cir. 2011). *Green* involved a mortgage fraud scheme similar to the one in this case. At sentencing, the district court determined the applicable loss amount using the same method employed in the PSR in this case, by "subtract[ing] the sale price the lender received after it recovered possession of the property from the amount of its original loan." *Id.* at 584. As in this case, some of the lenders in *Green* acquired the properties by being the highest bidder at public auction. On appeal, the defendant

argued that the proceeds from those sales should be credited against the loss amount. *Id*. at 583-84. The court held that the defendant's argument missed the mark.

> Where a lender forecloses and acquires the property at public auction by making a credit bid (*i.e.,* a bid that offers to cancel the outstanding principal, interest, and related fees in return for title to the property), the credit bid is not a reliable measure of the actual market value of the property. In a typical fraudulent mortgage scheme, a credit bid is highly likely to overvalue the property. The whole point of the fraud was to fool the lender into lending far more than the market value of the property, and then to disappear, leaving the lender with a property worth far less than the loan. Using a credit bid based on the fraudulently inflated loan amount to measure loss would surely understate the actual loss. Thus, in this situation, it would have been an error for the district court to use [the defendant's] proposed method of calculating loss.

*Id*. at 584 (citations omitted).

In this case, the defendant fraudulently induced lenders to extend loans that far exceeded the market values of the properties that secured them. To protect their financial interests, the lenders or their successors acquired title to the properties through the foreclosure process, but those transactions in no way offset their losses. At their core, the transactions were simply bookkeeping entries that the lenders were required to undertake to clear their titles to the properties. Clear titles were necessary to allow the lenders to ultimately obtain the highest possible prices when they sold the collateral in arm's length transactions, without the stigma of stress inherent in foreclosure auctions. To attach economic significance to the foreclosure deeds as advocated by the defendant makes no sense.

It is disingenuous for the defendant to argue that the economic harm he caused should be reduced by the inflated amounts the lenders had to pay themselves to acquire title to the mortgaged properties. The actual losses in this case were not realized until the lenders sold those properties to third parties and received payments that offset the outstanding balances on the

fraudulently obtained loans.  As the court in *Green* succinctly explained, it is those final transactions that should be used to determine the loss amount.  That was the approach applied in the PSR and it resulted in the legally correct calculation of the loss amount.  Accordingly, the defendant's objection the loss amount calculation should be overruled.

In his sentencing memorandum, the defendant objects to the inclusion in the total loss calculation of losses attributable to five properties that secured fraudulent loans.  (Defendant's Sentencing Memorandum, pgs. 10-14).  Paragraph 12 of the Addendum to the Presentence Report accurately addresses the bases on which these losses are calculable and included in the total loss amount.

### Restitution Was Properly Calculated in the Presentence Investigation Report

The restitution amounts listed in paragraph 64 of the Presentence Investigation Report were properly calculated using the same methodology required to calculate the loss amount.  The losses incurred by the victim lenders are readily identifiable and restitution to the various victims should be awarded according to the schedule outlined in the PSR.

Relying on the same argument he raised about the loss calculation, that loss should be calculated as of the time the victims acquired title to the properties, the defendant asserts that the restitution amounts in the PSR would be a windfall to the victims.  This is simply wrong.  "In [a] mortgage fraud case … the property stolen is cash --- not the real estate which serves as collateral.  Accordingly, the property stolen is only returned upon the resale of the collateral real estate and it is at that point that the offset value should be determined by the part of the cash recouped at the foreclosure sale."  *United States v. Robers*, 698 F.3d 937, 939 (7th Cir. 2012), *cert. granted*, 134 S. Ct. 470 (2013).  "[W]hat matters [in a mortgage fraud case] is when at least part of the cash was returned to the victims --- not when the victims received title to the houses

securing the loans. And the cash was returned to the victims only when the collateral houses securing the loans were eventually sold." *Id*. at 942. Accordingly, the restitution owed to the victims was properly calculated in the PSR as the difference between the outstanding principal balances on the fraudulently obtained loans and the funds the victims recouped through the eventual resale of the collateral properties.

The defendant's speculative argument that the restitution owed to some lenders should be reduced because they received settlements or damages awards in litigation about lax mortgage lending practices is of little moment. Restitution is appropriate in this case because the direct financial harm caused by the defendant's fraudulent activities is readily discernable. He should not be allowed to escape his obligation to make the victims whole on the basis that they may have received civil settlements from other parties in unrelated litigation.

<u>A Statutory Variance Is Not Warranted</u>

The defendant's argument that the sentencing guidelines should not be applied in this case because they fail to account for market conditions in the mortgage industry when he committed this crime should be rejected out of hand. The defendant's crime was opportunistic and calculated. He knew the mortgage industry well. He knew what loan products were available, what the various requirements for those products were, and what information needed to be on loan applications for them to be approved. He knew the vulnerabilities of the home loan system and he knew how to game the system. The defendant exploited those vulnerabilities to his own selfish ends. He lied and he induced others to lie to defraud lenders of millions of dollars. Such fraudulent conduct fails squarely within the ambit of the sentencing guidelines. The defendant is not entitled to a non-guidelines sentence because lax controls in the mortgage

industry provided him with the opportunity to set up a mortgage fraud scheme and to get away with it for as long as he did.

Similarly, the defendant's lack of a previous criminal history, his familial ties and obligations, and his apparent current psychological distress are not grounds for a statutory variance. None of these factors distinguish him from other similarly situated white collar defendants. Frequently, those convicted of white collar crimes like mortgage fraud do not have criminal histories. Moreover, the defendant's lack of a criminal history is accounted for under the sentencing guidelines by his designation in criminal history category I (PSR ¶ 35). The defendant's familial ties are also unremarkable. His concern about his relationship with his children and his obligation to support them financially is understandable, but it is not extraordinary and it is not a basis to grant him the relief of a non-guidelines sentence. It is also understandable that the defendant is experiencing a degree of psychological distress. He is apparently involved in a contentious divorce and he stands convicted of a serious crime and is facing a significant prison sentence. Experiencing anxiety and depression under these circumstances is commonplace and does not warrant statutory variance.

A statutory variance is also not justified to avoid an unwarranted sentencing disparity. The defendant's case is readily distinguishable from those of the other defendants who were convicted in connection with the defendant's fraudulent scheme. Each of the other defendants played a lesser role in the scheme than the defendant and was subordinate to him. The defendant was the ringleader and oversaw the entire criminal enterprise from its inception to its end. Moreover, all of the other defendants accepted responsibility for their roles in the scheme. They all entered guilty pleas and cooperated in the investigation of the scheme and the prosecution of the defendant. The defendant, on the other hand elected to go to trial, as was his right, despite

considerable evidence of his guilt.  Certainly, the defendant may not be penalized for exercising his trial rights, but he is also not entitled to the same type of sentence other defendants received that were based on their lesser roles in the scheme, their acceptance of responsibility, and their cooperation in the criminal investigation.

### Sentence Recommendation

The defendant's crime is serious and warrants a significant, yet proportionate sentence. A sentence of 135 months, which is at the low end of the applicable advisory sentencing guidelines range (PSR ¶ 54), would be reasonable and appropriate in this case.  Admittedly, it would be a lengthy sentence, but it would reflect the seriousness of the defendant's crime, it would be just, and it would promote respect for the law.  Additionally, and of critical importance in cases like this, it would deter others who may be inclined to commit similar crimes from doing so.  The defendant's blatant fraudulent activities not only cost lenders millions of dollars, it also impacted many New Hampshire communities and has come to the attention of those in the real estate and mortgage lending professions.  The defendant has enjoyed many advantages in life. He had the background and the wherewithal to earn an honest living and to benefit the community.  Instead, he elected to use his knowledge and skillset to defraud, with little or no regard for the harm he caused.  A sentence below the applicable advisory guidelines sentencing range would not adequately address his criminal conduct and would not promote respect for the law.

    Respectfully submitted,

    DONALD A. FEITH
    Attorney for the United States Acting Under
    Authority Conferred By 28 U.S.C. § 515

| | |
|---|---|
| Dated: March 6, 2014 | By: /s/Mark S. Zuckerman<br>Mark S. Zuckerman<br>Assistant United States Attorney<br>New Hampshire Bar No. 4865<br>United States Attorney's Office<br>53 Pleasant Street, 4th Floor<br>Concord, NH 03301<br>(603) 225-1552<br>mark.zuckerman@usdoj.gov |

## **CERTIFICATION**

I hereby certify that a copy of this Objection To The Defendant's Motion for a *Booker* Variance and Response To Defendant's Sentencing Memorandum has been served electronically, through ECF, on Michael J. Iacopino, Esq., and Jaye L. Rancort, Esq., 85 Brook Street, Manchester, NH 03104, counsel for the defendant on March 6, 2014.

/s/ Mark S. Zuckerman
Mark S. Zuckerman
Assistant United States Attorney